THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RENE SALCIDO-GONZALEZ,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 4:23-cr-00049-DN<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Defendant Rene Salcido-Gonzalez ("Salcido-Gonzalez") is charged with possession of methamphetamine with intent to distribute.[1] Salcido-Gonzalez filed a Motion to Suppress ("Motion"), seeking the suppression of evidence related to an April 18, 2023, traffic stop.[2] The Court held an evidentiary hearing on March 28, 2024.[3] As instructed, Salcido-Gonzalez filed Defendant's Memorandum on Automatic License Plate Readers[4] and then both the government[5] and Salcido-Gonzalez[6] filed proposed orders on the Motion. The government additionally filed a supplemental memorandum.[7] The Motion is DENIED because the traffic stop of Salcido-Gonzalez was based on observed traffic violations; because the use of an automatic license plate

---

[1] Indictment, docket no. 1, filed June 13, 2023.

[2] Motion to Suppress, docket no. 34, filed February 26, 2024.

[3] Minute entry for proceedings held before Judge David Nuffer, docket no. 38, filed March 28, 2024; Transcript of March 28, 2024 Motion to Suppress Hearing, docket no. 41, filed April 9, 2024 ("Tr.").

[4] Defendant's Memorandum on Automatic License Plate Reader, docket no. 43, filed April 11, 2024.

[5] [Proposed] Memorandum Decision and Order Denying Motion to Suppress ("Government Proposed Order"), docket no. 44, filed April 18, 2024.

[6] [Proposed] Memorandum Decision and Order Granting Motion to Suppress ("Salcido-Gonzalez Proposed Order"), docket no. 45, filed May 2, 2024.

[7] United States' Supplemental Memorandum in Response to Defendant's Proposed Memorandum Decision and Order Granting Motion to Suppress [DKT. 45] ("Govt. Supplemental Memo."), docket no. 48, filed May 16, 2024.

reader system was not unlawful; and because the actions taken by law enforcement during the

traffic stop were all in the scope supported by reasonable suspicion.

**Table of Contents**

I.      FINDINGS OF FACT.......................................................................................................... 3
        A.      Truck First Observed by Grand County Sheriff's Deputy Mike Miller ................. 3
        B.      Miller Observes Truck Commit Traffic Violations ................................................. 9
        C.      Miller Conducts Traffic Stop and Finds Narcotics .............................................. 13
II.     CONCLUSIONS OF LAW ............................................................................................. 21
        A.      The Initial Stop was Justified Because Miller Observed Salcido-Gonzalez
                Commit Traffic Violations.................................................................................... 21
                1.      Salcido-Gonzalez Failed to Signal for Two Seconds Prior to Initiating
                        Lane Change .............................................................................................. 22
                2.      Salcido-Gonzalez Failed to Maintain the Truck in the Driving Lane....... 23
        B.      Miller's Use of the LPR System Was Lawful ...................................................... 25
                1.      Miller's Use of the LPR System Was Not a Search Triggering Fourth
                        Amendment Protections............................................................................. 25
                2.      The Use of the LPR System Was Not Contrary to State Law ................. 29
        C.      The Traffic Stop Was Not Unlawfully Extended Because the Dog Sniff Did Not
                Improperly Delay the Stop and Because Miller Obtained Reasonable Suspicion of
                Drug Trafficking Prior to the Dog Sniff. ............................................................. 31
                1.      The Dog Sniff Did Not Improperly Extend the Duration of the Stop. ..... 33
                2.      Miller had Reasonable Suspicion Salcido-Gonzalez was Trafficking Drugs
                        Prior to the Dog Sniff................................................................................ 34
III.    CONCLUSION................................................................................................................ 35

## I.     FINDINGS OF FACT[8]

### A.     Truck First Observed by Grand County Sheriff's Deputy Mike Miller

1.      Deputy Mike Miller ("Miller") is employed as the Commander for the Major Crimes Task Force with Grand County Sheriff's Office and has been since February of 2023.[9] Prior to that, from 1992 to 2023, Miller served as a Sheriff's Deputy in Mesa County Colorado.[10]

2.      For 24 years with Mesa County, Miller worked drug interdiction and has continued to do so for Grand County.[11] Miller has received over a thousand hours of drug interdiction training and has also provided training on drug interdiction investigations for the last three years.[12]

3.      Miller has also received training and been certified as a K9 officer.[13] He currently has a drug detection K9 assigned to him.[14] Miller's K9 was certified to detect the odor of various narcotics in Utah in January of 2023.[15] The K9 had previously been certified to work with him to detect the odor of various narcotics in Colorado.[16]

---

[8] The following Findings of Fact are based on the testimony and evidence presented at the March 28, 2024, evidentiary hearing on the Motion. These Findings of Fact are taken from the Government Proposed Order, docket no. 44, filed April 18, 2024, and the Salcido-Gonzalez Proposed Order, docket no. 45, filed May 2, 2024, which included proposed findings of fact. Facts, or portions thereof, identified in the parties' proposed orders that do not appear in these Findings of Fact are either not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, some of these Findings of Fact may not be material to the disposition of the parties' motion but are nevertheless included to give background and context to the issues raised in the Motion. The facts have been restated in some instances.

[9] Tr. 11:23-12:11; 59:5-8, 24-25.

[10] Tr. 12:12-19.

[11] Tr. 13:5-9.

[12] Tr. 13:10-23.

[13] Tr. 53:25-54:2; 59:13-21.

[14] Tr. 53:25-54:2; 59:13-21.

[15] Tr. 54:3-5; 59:15-21.

[16] Tr. 59:15-25; 60:1-8.

4.      Miller was on duty the morning of April 18, 2023 around 6:45am.[17] Miller was alone in a marked patrol vehicle positioned in the center median of I-70 near mile marker 215.[18] Miller's vehicle was perpendicular to the interstate and he was watching eastbound traffic.[19] Miller placed his vehicle where the interstate is flat and straight in both directions of travel so as to be highly visible to passing traffic.[20] At this spot, I-70 is a four-lane highway, with two lanes going each direction.[21]

5.      Around 6:45 a.m., Miller saw a red Toyota truck ("Truck") approaching him while travelling in the right eastbound lane on I-70.[22] Although Miller did not confirm the speed via radar, he visually estimated the Truck to be travelling approximately 80 miles per hour, which is the posted speed limit.[23]

6.      As the Truck got closer, Miller observed the Truck slow to what he estimated as approximately 65 miles per hour.[24] Miller did not confirm the estimated speed via radar.[25] Miller testified that it is common for drivers who are driving over the speed limit to slow down when they see his patrol vehicle, but less common for drivers that are already traveling the speed limit to do so, especially when he is positioned as he was on April 18 where drivers could see him from a substantial distance.[26]

---

[17] Tr. 13:24-14:6; 60:19-21.

[18] Tr. 14:4-20.

[19] Tr. 14:4-20; 61:8-10.

[20] Tr. 14:15-15:11.

[21] Tr. 15:12-15.

[22] Tr. 15:16-22.

[23] Tr. 15:23-16:2; 62:22-25.

[24] Tr. 16:3-10.

[25] Tr. 62:22-25.

[26] Tr. 63:6-17; 64:10-20.

7.      Miller testified that he has observed drivers who, while going the speed limit, slow slightly when they see him, and then speed up after they pass him.[27] After the Truck passed Miller, it sped back up to about 75 miles per hour.[28]

8.      As the Truck passed Miller's patrol vehicle, the driver leaned back in his seat, and the driver's face went behind the B-pillar, the exterior support of the Truck between the front driver's seat and the rear passenger seat on the driver's side.[29]

9.      Miller testified that while it is not a hard and fast rule, he has had previous experience where people involved in criminal activity attempt to conceal their face when they encounter law enforcement.[30] Miller testified that the driver's movement behind the B-pillar was out of the ordinary and drew his attention.[31] Miller testified that the timing of this movement combined with the reduction of speed drew his attention.[32]

10.     Miller testified that he uses this observation tactic "a lot."[33] Miller explained that observations of a person's reaction to seeing law enforcement where they block or obstruct the view of their face has led him to catching all sorts of criminals including homicide suspects, auto theft suspects, and other wanted people."[34] Miller explained that a person might attempt to block their face by taking a drink of a coffee, smoking a cigarette, getting on a cell phone, or turning away from the officer.[35]

---

[27] Tr. 63:15-17.

[28] Tr. 64: 21-23.

[29] Tr. 16:11-14.

[30] Tr. 16:17-17:6.

[31] Tr. 16:17-17:6.

[32] Tr. 65:5-10; 22-25; 66:1-3.

[33] Tr. 16:15-17:6.

[34] Tr. 16:17-17:5, 20:17-24.

[35] Tr. 16:17-17:5, 20:17-24.

11.     Miller also saw that the Truck had a red and white Colorado fleet-vehicle license plate, commonly used on rental cars.[36] Miller explained that the Truck's fleet license plates raised his suspicion a small amount because, in his experience, drug traffickers often use rental cars to avoid having their personal vehicles seized by police and because it is easier for traffickers to distance themselves from any contraband found inside the rental car.[37] Miller explained that suspects can simply deny having any knowledge of the contraband.[38]

12.     Miller pulled out into the left eastbound lane of I-70 and began to follow the Truck.[39] At the time Miller pulled out behind the Truck, he had not observed any traffic violations and had no knowledge of any pre-existing investigation involving the Truck or the occupant.[40]

13.     As both vehicles continued traveling east on I-70, Miller pulled alongside the Truck on its left side.[41] When Miller looked over at the driver, he appeared to be a Hispanic male and the sole occupant in the Truck.[42] Miller testified that the driver's ethnicity did not add anything to his investigation and that he has stopped drug traffickers of all races and ethnicities.[43]

14.     As Miller looked over at the driver, the driver raised his left hand up to his mouth in what appeared to be an exaggerated yawn and then started rubbing his eye with the same

---

[36] Tr. 17:7-12.

[37] Tr. 17:13-18:7.

[38] Tr. 17:13-18:7.

[39] Tr. 18:8-15.

[40] Tr. 67:1-23.

[41] Tr. 67:24-68:2.

[42] Tr. 18:20-23; 68:19-21, 86:8-10.

[43] Tr. 68:10-12; 115:23-116:13.

hand.[44] This movement obstructed Miller's view of the driver's face.[45] Miller testified that he has had prior experiences with drivers using their hands to attempt to cover their face from law enforcement and that the driver's actions were again slightly suspicious to him.[46]

15.     Miller thought the Truck driver's yawn also could have innocently been the result of fatigue.[47] Miller noted that the stretch of I-70 relevant to his interaction with the Truck is boring, very long, and can cause driver fatigue.[48]

16.     While Miller was parallel with the Truck, he examined the Truck for any equipment violations and saw none.[49]

17.     Miller then dropped back from the truck and continued to follow it.[50] Miller ran a license plate check, which confirmed the Truck was a rental vehicle.[51]

18.     Miller also ran the license place through the Vigilant Automated License Plate Reader system ("LPR") to try and determine where the vehicle had been prior to his observations.[52]

19.     Miller testified that he had begun an investigation when he accessed the LPR database based on his observations of the Truck and driver.[53] Miller explained that the LPR

---

[44] Tr. 18:16-25; 19:1-3.

[45] Tr. 19:2-3.

[46] Tr. 20:3-6, 17-24; 16:17-17:6.

[47] Tr. 20:10-16.

[48] Tr. 20:12-16.

[49] Tr. 69:9-18; 69:24-70:1.

[50] Tr. 24:16-25.

[51] Tr. 21:4-6.

[52] Tr. 20:25-21:9.

[53] Tr. 85:20-86:25; 119:1-9.

could be useful in evaluating driver fatigue as part of his duty to protect the public when, like here, he sees a yawning driver rubbing their face.[54]

20.     According to the LPR, the Truck had been in Denver at 1:20 p.m. MST on Sunday, April 16,[55] and then at the Nevada-California border heading north at 10:11 p.m. MST on Monday April 17, approximately nine hours prior to when Deputy Miller saw the Truck.[56] Deputy Miller testified that the Nevada-California border is approximately seven hours driving time from where he saw the Truck.[57]

21.     Miller noted the LPR information suggested a quick round trip between Colorado and California between Sunday, April 16 and Tuesday, April 18.[58] Miller testified that the Truck's long trip in a short amount of time was consistent with a drug run to southern California.[59] The LPR information also indicated the Truck had been on the road throughout the night, which can also be consistent with drug trafficking behavior in Miller's training and experience.[60] Miller testified that drug traffickers prefer to travel at night because there is less law enforcement presence and it can be more difficult to see evidence of drug trafficking inside vehicles.[61]

---

[54] Tr. 118:13-24.

[55] Tr. 21:18-25.

[56] Tr. 21:25-22:10.

[57] Tr. 22:11-14.

[58] Tr. 21:14-24:3.

[59] Tr. 22:23-25; 23:1-23; 44:8-13.

[60] Tr. 23:16-23.

[61] *Id.*

22.     Miller testified that this quick, weekday travel seemed inconsistent to him with the typical weekend leisure travel he associated with a vacation or family reunion.[62] However, Miller testified that he does see quick week-day travel for funerals or other similar instances.[63]

23.     Miller explained that the LPR data showing that the Truck had made a quick trip to and from California in a short time period "really heightened" Miller's suspicions.[64]

24.     Miller was also concerned that the driver may be fatigued because the LPR data suggested the driver of the Truck had been driving overnight for at least seven of the last nine hours.[65]

25.     Miller indicated that based on his training and experience he would have continued following the Truck even without the LPR data because of the "changed driving behavior" Miller observed after the driver of the Truck saw Miller's marked patrol vehicle.[66]

**B.     Miller Observes Truck Commit Traffic Violations**

26.     Miller followed the Truck eastbound from the left lane while the Truck continued in the right lane.[67] Miller watched the Truck for traffic violations.[68] Deputy Miller testified that if he did not observe any traffic violations, he would not have stopped the Truck.[69]

---

[62] Tr. 23:24-25; 24:1-15.

[63] Tr. 24:6-9.

[64] Tr. 87:1-4.

[65] Tr. 23:12-15.

[66] Tr. 119:10-25.

[67] Tr. 24:16-25.

[68] Tr. 88:11-15.

[69] Tr. 89:1-3.

27.     The vehicles approached an area near mile marker 226 where the right lane was closed due to road construction and the Truck was required to merge into the left lane.[70] Miller remained 200 feet behind the Truck as they continued moving.[71]

28.     As the Truck approached the construction barrels closing the right lane, it began to move from the right lane to the left lane.[72] After the Truck started moving towards the left lane, Miller observed the left turn indicator turn on.[73] After the Truck crossed the lane divider into the left lane, the left turn indicator turned on a second time.[74] Miller estimated that the time from the turn indicator first coming on to the time the Truck crossed the dividing line into the left lane as three-quarters of a second.[75]

29.     As the Truck completed the lane change, Miller observed the Truck cross over the yellow shoulder line, with the outer edge of the Truck's driver-side tires extending two to four inches beyond the yellow shoulder line.[76] The Truck then corrected back into the left lane.[77]

30.     Miller observed the Truck cross the shoulder line about four to five additional times in a similar manner over the course of the next mile or so the vehicles traveled.[78]

---

[70] Tr. 25:1-13; 91:3-17.

[71] Tr. 24:16-25; 90:18-91:2.

[72] Tr. 25:18-25.

[73] Tr. 25:22-26:3.

[74] Tr. 25:22-26:3.

[75] Tr. 26:14-22.

[76] Tr. 26:4-9; 27:1-7.

[77] Tr. 27:14-16.

[78] Tr. 27:11-28:1.

31.     Miller testified that the traffic barrels that closed the right lane were completely within the right lane of travel, although one barrel may have been touching the center divider line.[79] Miller was able to maintain his lane of travel throughout this first construction zone.[80]

32.     Miller took photographs of the traffic barrels in the area where the Truck crossed the shoulder line later that same day and those photos were admitted as Government's Exhibits 1 and 2.[81] The photos show the traffic barrels are completely within the right lane.[82]

33.     Miller explained this section of road is straight and that he did not observe any weather or road conditions that would have been a reason for the Truck crossing the shoulder line.[83]

34.     The moving violations Deputy Miller saw gave him additional concern that the driver of the Truck was fatigued.[84]

35.     At the end of the first construction zone, the Truck changed lanes from the left lane back to the right lane.[85] Miller saw that the driver signaled the lane change and felt it was close to two seconds prior to the lane change and so Miller did not consider it a traffic violation.[86]

36.     After seeing these violations, Miller decided he was going to stop the Truck, but chose not to initiate a traffic stop directly after the first construction zone ended because he was

---

[79] Tr. 29:1-5.

[80] Tr. 121:15-23.

[81] Tr. 29:20-25. The same photos were also admitted as Defense Exhibits 503 and 504.

[82] Tr. 30:1-6, 22-25; 31:1.

[83] Tr. 28:23-29:16.

[84] Tr. 28:2-22.

[85] Tr. 32:6-8.

[86] Tr. 32:9-16.

concerned about the safety of the driver given the road conditions.[87] The area where the first construction zone ends has a curve that could be dangerous for drivers to navigate.[88]Miller continued following the Truck from a distance of around 200 feet and the two vehicles approached a second construction zone with another right lane closure.[89]

37.     As the Truck approached the lane closure in the second construction zone, the Truck merged from the right lane to the left lane.[90] As it did at the first construction zone, the Truck began to move towards the left lane, the left turn indicator came on, the Truck crossed into the left lane, and then the turn indicator came on a second time.[91] Miller described it as an abrupt lane change.[92] Although Miller did not use a stopwatch to calculate the time that passed from the turn indicator coming on to when the Truck crossed over into the left lane, Miller was confident it was less than one second.[93]

38.     As the two vehicles passed through the second construction zone, Miller saw that some of the traffic barrels were at least partially in the left lane.[94] Miller also testified that the barrels in the second construction zone encroached into the travel lane sufficiently to excuse crossing onto the shoulder which Miller said was justified and would not be a moving violation.[95]

---

[87] Tr. 32:25; 33:1-3.

[88] Tr. 29:8-16.

[89] Tr. 32:17-22.

[90] Tr. 33:15-25.

[91] Tr. 33:15-25.

[92] Tr. 33:20-21, 101:23-102:3.

[93] Tr. 101:13-102:3.

[94] Tr. 34:15-22.

[95] Tr. 100:14-25.

39.     In the second construction zone there was a construction barrel tipped over obstructing part of the left lane.[96] Miller observed the Truck slow down but then strike the base of one of the tipped barrel.[97] As Miller approached the same barrel, he slowed significantly more than the Truck and was able to maneuver his patrol vehicle around it by using the shoulder.[98]

## C.   Miller Conducts Traffic Stop and Finds Narcotics

40.     After the second construction zone ended, Miller initiated a traffic stop on the Truck.[99] Miller stopped the Truck at approximately 7:02 a.m., roughly 17 minutes after he first observed the Truck.[100]

41.     Miller attempted to activate his body worn camera during the course of the stop.[101] However, Miller's body worn camera malfunctioned and did not record.[102]

42.     Miller's patrol vehicle was equipped with a dash-mounted camera.[103] The dash cam is constantly running but does not preserve any video until thirty seconds prior to activation of lights and sirens.[104] The audio from the dash cam is not recorded until lights and sirens are activated.[105] The audio from the dash cam system is recorded only on a microphone inside the

---

[96] Tr. 34:5-9.

[97] Tr. 34:5-9.

[98] Tr. 34:10-11.

[99] Tr. 34:23-25.

[100] Tr. 60:21-61:5. Government's Exhibit 3 shows Salcido-Gonzalez pull over and Miller stop his vehicle behind Salcido-Gonzalez 1 minute 10 seconds after the dash cam began recording.

[101] Tr. 35:3-17.

[102] *Id.*

[103] Tr. 35:18-19.

[104] Tr. 36:2-6.

[105] Tr. 36:7-10.

vehicle.[106] Because of how the dash cam is set up, none of the traffic violations were captured on video.[107]

43.     Video of the traffic stop recorded by the dash cam's external forward-facing angle was admitted as Government's Exhibit 3. A second video of the internal view of Miller's patrol vehicle was recorded by the dash cam and was admitted as Government's Exhibit 4. Both videos begin approximately 30 seconds before Miller activated his lights and sirens.[108]

44.     Within 30 seconds of the vehicles stopping on the side of the interstate, Miller approached the Truck from the passenger side and positioned himself by the front passenger door.[109] The passenger window was rolled down and Miller could see into the Truck.[110]

45.     The Truck had four doors and Miller saw that the back seat was folded up.[111] On the floor of the back seat area, Miller saw a large bulky object that was almost completely covered by a blanket.[112] The object was large enough that it extended behind both the driver's seat and the front passenger seat.[113] On top of the blanket was a small duffel bag or suitcase.[114] During the course of his interaction with the driver at the Truck, Miller could see what appeared to be black plastic underneath parts of the blanket.[115] It also appeared another object was under the blanket around the center hump of the back seat area.[116]

---

[106] Tr. 36:11-15.

[107] Tr. 90:5-7.

[108] Tr. 36:2-3.

[109] Tr. 39:25; 40:1-3; Government's Exhibit 3 at 0:01:36.

[110] Tr. 40:4-25; 41:1-3.

[111] Tr. 40:11-16.

[112] Tr. 40:12-16.

[113] Tr. 40:14-16.

[114] Tr. 40:16-17.

[115] Tr. 40:19-23.

[116] Tr. 40:24-25.

46.     Miller testified that, in his training and experience, he has seen multiple instances where drug traffickers attempt to further conceal contraband hidden in an item like a suitcase or plastic while inside a vehicle by also covering it with a blanket.[117] At this point, Miller suspected possible drug trafficking.[118]

47.     Miller spoke with the driver and identified him as Salcido-Gonzalez.[119] Miller explained to Salcido-Gonzalez the reason for the stop was traffic violations for failing to properly signal before a lane change and for crossing the shoulder line.[120] Miller also asked Salcido-Gonzalez if he was tired, which Salcido-Gonzalez denied.[121]

48.     Miller asked Salcido-Gonzalez how long he had been driving and Salcido-Gonzalez replied that he had been driving for only a couple hours.[122] When Miller asked where Salcido-Gonzalez was coming from, he responded that he was coming from California, but had stopped for a couple hours and slept.[123]

49.     Miller asked for Salcido-Gonzalez's driver's license, registration, and rental agreement.[124]

---

[117] Tr. 41:4-17; 108:15-109:6.

[118] Tr. 108:24-25; 41:4-17.

[119] Tr. 41:18-25; 42:1-4.

[120] Tr. 42:10-14.

[121] Tr. 42:15-16.

[122] Tr. 42:16-17.

[123] Tr. 42:17-20.

[124] Tr. 42:23-43:5.

50.     As Salcido-Gonzalez looked for his license and vehicle documents, Miller asked him how long he was in California.[125] Salcido-Gonzalez said he had been in California for three days for the Coachella music festival.[126]

51.     This information contradicted the LPR data indicating that the Truck had recently been in Denver.[127] This incongruity further raised Miller's suspicions that some other illegal activity was occurring.[128]

52.     As Salcido-Gonzalez continued looking for the requested documents, Miller asked him if he went to California alone.[129] Salcido-Gonzalez replied that he was in California with his girlfriend.[130] Salcido-Gonzalez explained that his girlfriend flew out to California and that he drove out to meet her.[131] Miller characterized these answers as hesitant and the travel arrangement as odd.[132] Salcido-Gonzalez later added that his girlfriend had to fly back to take care of a baby.[133]

53.     Salcido-Gonzalez provided his license, but could not find any physical documents in the Truck and he appeared to be looking for documentation on his phone.[134]

54.     Salcido-Gonzalez explained that his girlfriend rented the truck, but that he was listed as an additional driver.[135]

---

[125] Tr. 43:6-13.

[126] Tr. 43:9-13.

[127] Tr. 44:2-5.

[128] Tr. 44:6-8.

[129] Tr. 43:14-16.

[130] Tr. 43:17-19.

[131] Tr. 43:19-22.

[132] Tr. 43:17; 44:14-23.

[133] Tr. 46:8-19.

[134] Tr. 44:24-45:5.

[135] Tr. 45:13-18.

55.     Miller testified that an absent third-party renting the Truck for Salcido-Gonzalez further raised his suspicions of potential drug trafficking.[136] Miller explained that using third parties to rent vehicles can allow drivers with contraband to further distance themselves from responsibility if any contraband is found in the vehicle.[137]

56.     Miller also testified that in his experience, if a person other than the listed driver on the rental agreement is driving a rental car, the rental car company may consider the rental agreement void and demand the return of their property.[138]

57.     Miller asked Salcido-Gonzalez to come with him to his patrol vehicle while he looked for the rental agreement on his phone to speed up the traffic stop.[139] Specifically, Miller planned to have dispatch run Salcido-Gonzalez's driver's license information while Salcido-Gonzalez looked for the rental agreement on his phone.[140]

58.     Miller testified that he thought Salcido-Gonzalez was very hesitant and appeared more nervous than the average driver Miller interacts with during traffic stops.[141] Miller also noticed that Salcido-Gonzalez's hands were shaking as he handed his license to Miller.[142]

59.     Salcido-Gonzalez exited the Truck and both he and Miller got into Miller's patrol vehicle.[143] At this point, the vehicles had been stopped on the side of the interstate for just over 3

---

[136] Tr. 45:19-25.

[137] *Id.*

[138] Tr. 45:25-46:7.

[139] Tr. 46:20-25; 47:1-3.

[140] Tr. 47:4-8.

[141] Tr. 47:9-16.

[142] Tr. 47:11-12.

[143] Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:03:57-0:04:25, Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:04:20-0:04:25.

minutes.[144] Miller testified that in his estimation, Mr. Salcido-Gonzalez was not free to leave.[145] In the dash cam video of the patrol vehicle's interior, Salcido-Gonzalez does not appear especially nervous.[146]

60.     After getting into the patrol vehicle, Miller provided information from Salcido-Gonzalez's driver's license to dispatch to determine his status as a driver and whether there were any warrants for him.[147] Miller provided this information to dispatch via instant message because radio traffic in that area can be spotty.[148] Once Miller sent the information to dispatch, he then immediately radioed dispatch to confirm they received it.[149]

61.     Salcido-Gonzalez continued looking through his phone for the Truck rental agreement.[150] Salcido-Gonzalez showed Miller a photo of one page of a rental agreement on his phone.[151] The image showed that the Truck was to be returned the next day, April 19, but did not show who rented the Truck, when it was rented, or the listed drivers.[152]

62.     Miller asked Salcido-Gonzalez to provide the entire rental agreement.[153] Salcido-Gonzalez was unable to provide any additional portions of a rental agreement for the Truck.[154]

---

[144] Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:03:57-0:04:25, Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:04:20-0:04:25.

[145] Tr. 112:13-113:6.

[146] Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:04:20-0:07:38.

[147] Tr. 48:5-25.

[148] Tr. 48:13-19.

[149] Tr. 48:20-22; 50:5-14.

[150] Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:04:20-0:07:38; Tr. 49:1-4.

[151] Tr. 49:1-9.

[152] Tr. 49:6-16.

[153] Tr. 49:21-50:1.

[154] Tr. 49:21-50:4.

63.    The entirety of the rental agreement was important to Miller so he could determine whether Mr. Salcido-Gonzalez had legal possession of the Truck.[155] Miller did not then contact the rental car company to confirm whether Mr. Salcido-Gonzalez was an authorized driver of the Truck.[156]

64.    While waiting for the return of information from dispatch, Miller informed Salcido-Gonzalez that he was going to run his K9 around the Truck.[157] Miller told Salcido-Gonzalez that he was going to perform a dog sniff just under six minutes after the vehicles stopped on the side of the road.[158] At that point, Miller had not written a citation for Salcido-Gonzalez's moving violations.[159] Miller testified he does not write many traffic citations.[160]

65.    Miller got out of his patrol vehicle to retrieve his K9.[161] He did not instruct Salcido-Gonzalez to remain in the vehicle.[162] Salcido-Gonzalez also got out of the patrol vehicle.[163] Miller instructed Salcido-Gonzalez to get back in the patrol vehicle, but Salcido-Gonzalez remained outside.[164]

66.    Miller then gave Salcido-Gonzalez three options while he conducted a K9 sniff of the Truck: 1) he could remain in the patrol vehicle; 2) he could stand on the shoulder; or 3) he

---

[155] Tr. 49:17-20.

[156] Tr. 113:16-17.

[157] Tr. 50:15-51:2.

[158] Government's Exhibit 3 at 0:06:53-0:06:57.

[159] Tr. 50:20-51:2; 111:13-16.

[160] Tr. 111:17-112:1.

[161] Tr. 51:3-14; Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:06:54-0:07:43.

[162] Tr. 51:21-23; Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:06:52-0:07:33.

[163] Tr. 51:15-18, Miller Dashboard Camera - Vehicle Interior, Government's Exhibit 4, at 0:06:54-0:07:33.

[164] Tr. 51:19-52:1.

could stand in front of the Truck.[165] Salcido-Gonzalez chose to remain outside the patrol vehicle standing on the passenger side on the shoulder.[166]

67.     Miller then began to deploy his K9, starting at the front of the Truck.[167] Miller began the dog sniff almost exactly seven minutes after the vehicles came to a complete stop on the side of the interstate.[168]As the K9 began smelling around the driver's side of the Truck, Miller's back was to his patrol vehicle.[169] The K9 began to alert to the odor of narcotics, but had not yet provided a final indication.[170]

68.     As Miller and his K9 were near the driver's door of the Truck, Salcido-Gonzalez moved near the front of the driver's side of Miller's patrol vehicle, directly behind Miller.[171]

69.     Salcido-Gonzalez's movement behind Miller gave Miller great concern.[172] Miller then pulled the K9 off the Truck and instructed Salcido-Gonzalez to stand on the passenger side of the patrol vehicle.[173] Miller pulled the dog off the dog sniff to move Salcido-Gonzalez back to the passenger side of the patrol vehicle less than 30 seconds after beginning the dog sniff. The vehicles had been stopped on the side of the road just under seven and a half minutes.[174]

---

[165] Tr. 52:15-19.

[166] Tr. 55:5-17.

[167] Tr. 53:17-24; 54:11-12; Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:08:03-0:08:22.

[168] Government's Exhibit 3 at 0:08:09.

[169] Tr. 54:23-25; Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:08:16-0:08:22.

[170] Tr. 54:14-22, 56:1-5.

[171] Tr. 54:23-25; Miller Dashboard Camera - Vehicle Exterior, Government's Exhibit 3, at 0:08:16-0:08:22.

[172] Tr. 54:25-55:1.

[173] Tr. 55:1-6.

[174] Government's Exhibit 3 at 0:08:22-0:08:33.

70.     In Miller's training and experience, pulling the K9 off a task is a corrective behavior and communicates to the dog that its current action is not acceptable.[175]

71.     Miller restarted the dog sniff just under eight minutes after the vehicles had stopped and completed the dog sniff in less than two minutes.[176] The K9 ultimately provided a final indication to the odor of narcotics coming from the Truck.[177] Miller then searched the vehicle and found approximately 100 lbs. of methamphetamine inside.[178]

## II.     CONCLUSIONS OF LAW

### A.   The Initial Stop was Justified Because Miller Observed Salcido-Gonzalez Commit Traffic Violations

The Fourth Amendment protects individuals from "unreasonable searches and seizures."[179] A traffic stop is a seizure under the Fourth Amendment.[180] A traffic stop is valid under the Fourth Amendment "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[181] Courts evaluating the lawfulness of traffic stops look at "whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."[182] This is an objective inquiry— an officer's subjective intent in making the stop is irrelevant to evaluating reasonable

---

[175] Tr. 55:1-6, 21-25.

[176] Government's Exhibit 3 at 0:09:00-0:10:45.

[177] Tr. 57:13-16.

[178] Tr. 57:17-20.

[179] U.S. Const. amend. IV.

[180] *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, (1979)).

[181] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

[182] *Id.*

suspicion.[183] An investigative detention is based on reasonable suspicion if the detaining officer has "a particularized and objective basis for suspecting the person stopped of criminal activity."[184] This determination is made by looking at the "totality of the circumstances."[185] "The test for reasonable suspicion does not call for Defendant to have actually violated the law, but rather, the government need only demonstrate [the officer] reasonably believed that Defendant [violated the law]."[186]

Miller observed Salcido-Gonzalez violate two traffic laws which created reasonable suspicion justifying a traffic stop: (1) Salcido-Gonzalez failed to signal for the required two seconds prior to changing lanes on two observed occasions, and (2) Salcido-Gonzalez failed to maintain his vehicle in the driving lane.

### 1. Salcido-Gonzalez Failed to Signal for Two Seconds Prior to Initiating Lane Change

While driving in Utah, "a person may not turn a vehicle, merge into a continuing lane from a lane of travel that is ending, or otherwise move right or left on a roadway or change lanes until . . . an appropriate signal has been given. . . ."[187] An appropriate "signal of intention to turn right or left or to change lanes shall be given continuously for at least two seconds preceding the beginning of the movement."[188] This statute "unambiguously states that a turn signal must be

---

[183] *United States v. Gonzales*, 535 F.3d 1174, 1181 (10th Cir. 2008).

[184] *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (quotations omitted).

[185] *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740 (2002).

[186] *United States v. Chavez*, No. 19-4121, 2021 WL 4438742, at *3 (10th Cir. Sept. 28, 2021).

[187] Utah Code Ann. § 41-6a-804(1)(a).

[188] Utah Code Ann. § 41-6a-804(1)(b).

given for at least two seconds before . . . [a] lane change."[189] Observation of a failure to properly signal prior to a lane change creates reasonable suspicion justifying a traffic stop.[190]

Miller observed Salcido-Gonzalez change lanes twice without a proper signal. Miller testified that as Salcido-Gonzalez approached each of two construction zones with a lane-merge, Salcido-Gonzalez began his movement from the right lane to the left lane without signaling for the required two seconds.[191] Both of these lane changes violated Utah's traffic law[192] and each violation independently created reasonable suspicion sufficient for Miller to initiate a traffic stop of Salcido-Gonzalez.

### 2.   Salcido-Gonzalez Failed to Maintain the Truck in the Driving Lane

When driving on a marked road in Utah, a person operating a vehicle "shall keep the vehicle as nearly as practical entirely within a single lane[.]"[193] Analyzing a Kansas statute with identical "as nearly as practical," the Tenth Circuit found that the observation of an isolated occurrence of a vehicle driving outside a marked lane did not automatically create probable cause to stop the vehicle for a traffic violation.[194] Instead, courts should "analyze objectively all the surrounding facts and circumstances to determine whether the officer had the probable cause necessary to justify the stop."[195] Factors appropriate for evaluating whether maintaining a lane

---

[189] *State v. Olivarez*, 2017 UT App 42, ¶ 17, 392 P.3d 1007, 1010.

[190] *Id.* at ¶ 13.

[191] *Supra* Findings of Fact ¶¶ 27-29, 37.

[192] Utah Code Ann. § 41-6a-804(1)(a).

[193] Utah Code Ann. §41-6a-710(1)(a)(i).

[194] *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999).

[195] *Id.*

was practicable include weather, traffic, road conditions, and whether the path of the road was straight or not.[196]

Miller observed multiple instances where Salcido-Gonzalez failed to maintain his lane under circumstances where it was practicable to stay in his lane. The portion of Interstate 70 Salcido-Gonzalez was traveling on when he crossed over the outside line was relatively straight, did not have an excessive gradient, did not have excessive surface issues or debris, and occurred without any weather or severe winds.[197] While there were traffic barrels in the right lane, they did not encroach into the left lane to make maintaining the left lane impracticable. Miller observed Salcido-Gonzalez cross over onto the shoulder five or six times.

In *United States v, Ozbirn*, the Tenth Circuit found probable cause existed when a motor home drifted onto the shoulder twice where there was not any weather or road conditions that would have made it difficult to maintain a lane.[198] So too here. Miller's observations of multiple instances where Salcido-Gonzalez failed to maintain his lane in conditions that did not make maintaining the lane impracticable created reasonable suspicion sufficient for Miller to initiate a traffic stop. This is another independent basis justifying the traffic stop.

Miller's observations of Salcido-Gonzalez violating two different traffic laws provided reasonable suspicion that justified Miller initiating a traffic stop. The government has argued additional bases justifying the initial traffic stop including to check for fatigue,[199] for careless

---

[196] *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996).

[197] *Supra* Findings of Fact ¶¶ 32-33; Government's Exhibit 1; Government's Exhibit 2.

[198] *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999).

[199] In *Ozbirn,* the Tenth Circuit reasoned that a motorhome crossing onto the shoulder twice within a quarter mile without any adverse road conditions created reasonable suspicion that the driver was sleepy to justify a traffic stop. *Ozbirn*, 189 F.3d at 1199. However, this order does not reach the issue of whether Miller had reasonable suspicion of Salcido-Gonzalez's fatigue to justify a stop.

driving,[200] and for suspicion of drug trafficking.[201] Because the observed traffic violations for failure to signal and failure to maintain a lane each provided a sufficient basis to justify the stop, this order does not reach these additional justifications advanced by the government.

## B.   Miller's Use of the LPR System Was Lawful

Miller used an LPR system to check the movement of the Truck's license plate as Miller followed Salcido-Gonzalez. The LPR system provided Miller with information that the Truck had been in the Denver area in the early afternoon of Sunday April 18, and then had been spotted headed northbound on I-15 crossing from California into Nevada on Monday, April 19, some 9 hours prior to the traffic stop. [202] Miller estimated it would take roughly seven hours to travel from the Nevada border of the LPR data to the location of the traffic stop.[203] Although Salcido-Gonzalez contends the use of the LPR system was an unlawful search and violated state law, Fourth Amendment jurisprudence and Utah's LPR statute both permit Miller's use of the LPR system. And the use of the LPR system does not enter into the analysis of validity of the stop.

### 1.   Miller's Use of the LPR System Was Not a Search Triggering Fourth Amendment Protections.

Miller's use of the LPR system did not violate the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[204] The core of the Fourth Amendment is its protection of "liberty and privacy from arbitrary and oppressive interference by government

---

[200] This order does not address whether there was reasonable suspicion for careless driving because the analysis is duplicative of the reasonable suspicion determination for failure to signal and failure to maintain a lane. Because this order finds reasonable suspicion for the underlying violations, evaluations of careless driving is not necessary.

[201] This order does not reach the issue of whether Miller had reasonable suspicion Salcido-Gonzalez was trafficking drugs prior to the initial stop.

[202] *Supra* Findings of Fact ¶¶ 18-20.

[203] *Id.* ¶ 20.

[204] US. Const. Amend. IV.

officials."[205]A Fourth Amendment "search" occurs when there is an "official intrusion into [a] private sphere" where a person is seeking to "preserve something as private" and that "privacy expectation is one that society is prepared to recognize as reasonable.[206] The Supreme Court has recognized two guideposts for evaluating Fourth Amendment protections: (1) the Fourth Amendment seeks to "secure the privacies of life against arbitrary power"; and (2) "a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance."[207]

Under the Fourth Amendment, ordinarily a "person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movement from one place to another."[208] There is a "lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects."[209] Moreover, a vehicle "has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."[210] Additionally, "it is unreasonable to have an expectation of privacy in an object required by law" to be visible from the exterior of the vehicle because the "exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a search."[211]

Although privacy interests are reduced in a vehicle, a "citizen does not surrender all the protections of the Fourth Amendment by entering an automobile."[212] Supreme Court decisions

---

[205] *United States v. Ortiz*, 422 U.S. 891, 895 (1975).

[206] *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (cleaned up) (citation omitted).

[207] *Carpenter*, 585 U.S. at 305 (internal quotation marks and citations omitted).

[208] *United States v. Knotts*, 460 U.S. 276, 281, 103 S. Ct. 1081, 1085 (1983).

[209] *Id.*

[210] *Id.*

[211] *New York v. Class*, 475 U.S. 106, 114 (1986).

[212] *Id. at* 112.

related to movement tracking and privacy interests while traveling in cars demonstrate types of official intrusions that are problematic under the Fourth Amendment and other intrusions that are not problematic. On one end, visual surveillance of a person traveling in a car is not a search under the Fourth Amendment.[213] Similarly, the use of a radio transmitter that could be picked up by a radio receiver to trace the movements of a five-gallon drum transported in a car likewise did not violate the Fourth Amendment.[214] The Supreme Court explained as follows:

> [T]he fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of [defendant's] automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case."[215]

On the other end of the spectrum, the use of a GPS tracker on a vehicle has been found to violate the Fourth Amendment.[216] Although the *Jones* case evaluating GPS trackers was decided on trespass grounds, a concurring opinion noted that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."[217] In a later case, the Supreme Court evaluated the use of cell phone location data and determined that the use of such data to track a person was a Fourth Amendment search.[218] The *Carpenter* Court explained that like "GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political,

---

[213] *United States v. Knotts*, 460 U.S. 276, 285, 103 S. Ct. 1081, 1087, 75 L. Ed. 2d 55 (1983)

[214] *Id. at* 277-278, 285.

[215] *Id.* at 282.

[216] *United States v. Jones*, 565 U.S. 400, 404 (2012).

[217] *Id.* at 415.

[218] *Carpenter v. United States*, 585 U.S. 296, 310 (2018).

professional, religious, and sexual associations. These location records hold for many Americans the privacies of life."[219]

Miller's use of the LPR system was not a search for Fourth Amendment purposes. On the record here, the LPR system Miller used was unlike GPS Tracking or cell phone tower data information because the LPR system at issue did not operate at the granular level of detail that would expose the intimate details of an individual's life. Miller explained the limitations of the LPR system: "The vehicle and license plate had been captured by a license plate reader in the Denver area. Denver, like a lot of metropolitan cities, there's Aurora, Lakewood, so there's a lot of smaller cities within that corporation; but [the LPR system] just listed as the Denver area."[220] There was a second license plate capture at the California-Nevada border in Prim, Nevada.[221] Two data points, one of which only pointed generally to a metropolitan area, is not similar to constant GPS or cell tower data. Two license plate locations do not reveal the whole of physical movement or personal facts that would run afoul of Fourth Amendment protections. Other courts looking at LPR systems have reached similar conclusions and found the use of LPR systems to be constitutional.[222]

Undoubtedly as LPR systems and other technologies advance, there will likely be a future time where LPR systems or other similar technologies will need additional scrutiny to see if they

---

[219] *Id.* at 311 (internal quotation marks and citation omitted).

[220] Tr. 21:18-23

[221] Tr. 22:1-6.

[222] *United States v. Toombs*, 671 F. Supp. 3d 1329, 1342 (N.D. Ala. 2023) ("For all of these reasons, the motion to suppress should be denied to the extent it raises a Fourth Amendment challenge to the [LPR system] data."); *United States v. Wilcox*, 415 F. App'x 990, 992 (11th Cir. 2011) ("Georgia law requires license plates to be displayed at all times on the rear of the vehicle so that it is plainly visible. . . . Given the Supreme Court's Fourth Amendment precedent, the district court did not commit plain error in concluding that Wilcox did not have a reasonable expectation of privacy in the plainly visible license plate and that the officers' use of the tag reader in this case did not violate the Fourth Amendment."); *United States v. Brown*, No. 19 CR 949, 2021 WL 4963602, at *3–4 (N.D. Ill. Oct. 26, 2021) (Finding two dozen LPR snapshots over ten weeks did not reveal intimate details of defendant's life.).

violate Fourth Amendment protections. But on the record here concerning the LPR system at issue, there is no evidence that Miller's use of the LPR system violated the protections of the Fourth Amendment.

### 2. The Use of the LPR System Was Not Contrary to State Law

At the time of the traffic stop, Utah statutory law provided that an "automatic license plate reader system may be used" by a law enforcement officer "for the purpose of protecting public safety, conducting criminal investigations, or ensuring compliance with local, state, and federal laws."[223] Miller's actions using the LPR was consistent with this statutory direction. "When interpreting a statute, [courts] look first to its plain language to determine its meaning."[224] "Only when [courts] find that a statute is ambiguous do [they] look to other interpretive tools."[225] There is no need to go beyond the plain language of the LPR statute because it clearly permitted Miller's use of the LPR system. Miller's use of the LPR system was justified because for the purpose of conducting an investigation and for the purpose of protecting public safety.

Miller used the LPR as he was monitoring traffic as a commander for the Major Crimes Task Force where he oversees narcotic investigation.[226] Miller has worked in drug interdiction for 24 years and has conducted over 1400 interdiction stops.[227] As Miller was monitoring I-70, he observed a Truck that was driving approximately the speed limit slow down significantly once it saw the patrol car.[228] Miller explained that the Truck slowed down significantly more than

---

[223] Utah Code Ann. § 41-6a-2003.

[224] *State v. Anderson*, 2007 UT App 304, ¶ 11 (citation omitted).

[225] *Id*.

[226] *Supra* Findings of Fact ¶ 1.

[227] *Id.* ¶ 2; Tr. 12:1-13:9, 109:4-6.

[228] *Supra* Findings of Fact ¶¶ 5-6.

other non-speeding cars Miller normally observed.[229] Miller also noticed the Truck had a red and white Colorado license plate used for fleet vehicles, such as rental cars.[230] Miller noticed the driver leaned back in a manner that obstructed Miller's view of the driver as he passed Miller.[231] Miller started to follow the truck and when he pulled alongside, the driver appeared to cover his face with his hand as if he were yawning and rubbing his eyes.[232] Then Miller ran the Truck license plate and confirmed it was a rental car.[233] At this point, Miller ran the license plate through the LPR system.[234]

A law enforcement officer does not need reasonable suspicion to begin passively observing a party or to begin conducting an investigation. Miller described that his observations of Salcido-Gonzalez driving the Truck drew his attention and raised his suspicions.[235] Miller testified that drug traffickers commonly use rental cars, commonly travel at night, and may use tactics such as obstructing their face from law enforcement.[236] Using the LPR to gain additional information or dispel his initial suspicions squarely fits within the statutory authorization for LPR usage.

Given the early hour, the desolate road, and Miller's observation of Salcido-Gonzalez yawning and rubbing his eyes, Miller was also justified to use the LPR to gather additional information that could help him understand whether Salcido-Gonzalez was fatigued. There is no

---

[229] *Id.* ¶ 6.

[230] *Id.* ¶ 11.

[231] *Id.* ¶¶ 8-9.

[232] *Id.* ¶¶ 12, 14.

[233] *Id.* ¶ 17.

[234] *Id.* ¶ 18.

[235] *Id.* ¶ 19.

[236] *Id.* ¶ 14.

evidence that Miller's use of the LPR was not for the purpose of either protecting public safety or as part of his criminal investigation. Accordingly, Miller's use of the LPR was consistent with Utah laws governing LPRs in force at the time of the stop.

**C.   The Traffic Stop Was Not Unlawfully Extended Because the Dog Sniff Did Not Improperly Delay the Stop and Because Miller Obtained Reasonable Suspicion of Drug Trafficking Prior to the Dog Sniff.**

A traffic stop that exceeds "the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[237] "A seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."[238] During a traffic stop, acceptable activities an officer may perform include checking vehicle registration, reviewing driver's license validity, determining whether outstanding warrants exist, and confirming proof of insurance. An officer may also ask travel related questions[239] and confirm the driver has the right to operate the vehicle, including reviewing a car rental agreement.[240] Law enforcement is also permitted to "conduct certain unrelated checks during an otherwise lawful traffic stop" and "ask questions aimed at uncovering other criminal conduct . . . ."[241]

Performing "a dog sniff for narcotics [is] not part of an officer's traffic mission . . . ."[242] Whether a dog sniff transforms a lawful traffic stop into an unreasonable seizure turns on whether the sniff prolongs or adds time to the stop.[243] An officer may not divert from traffic

---

[237] *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

[238] *Id*. at 350-51.

[239] *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).

[240] *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023).

[241] *Rodriguez*, 575 U.S. at 372 n.2.)

[242] *United States v. Dawson*, 90 F.4th 1286, 1291 (10th Cir. 2024).

[243] *Rodriguez*, 575 U.S. at 357.

related activities and prolong a traffic stop to conduct a dog sniff unless the dog sniff is supported by independent reasonable suspicion.[244] However, a dog sniff performed during a traffic stop that does not prolong the stop, such as while an officer is waiting for dispatch to return information about criminal history or outstanding warrants does not violate the fourth amendment.[245] An officer, however, cannot request a criminal history for the sole purpose of lengthening the stop to investigate criminal activity.[246]

An officer may prolong a traffic stop to conduct criminal investigation if she has "the reasonable suspicion ordinarily demanded to justify detaining an individual."[247] Reasonable suspicion is "[b]ased upon that whole picture" and requires the officer to have "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[248] Reasonable suspicion may be based on "objective facts" that are "meaningless to the untrained"; trained and experienced officers can be combine seemingly innocuous facts "with permissible deductions . . . to form a legitimate basis for suspicion of a particular person and for action on that suspicion."[249]

Miller did not improperly prolong the stop of Salcido-Gonzalez by conducting a dog sniff because the stop was not prolonged—Miller was still waiting on information from dispatch.[250] Additionally, Miller had reasonable suspicion of drug trafficking prior to performing the dog sniff so Miller was justified even if Miller prolonged the stop.

---

[244] *Dawson*, 90 F.4th at 1291.

[245] *United States v. Chavez*, No. 19-4121, 2021 WL 4438742, at *5 (10th Cir. Sept. 28, 2021).

[246] *Id.* at *4.

[247] *Rodriguez*, 575 U.S. at 355.

[248] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[249] *Id.* at 418-19.

[250] *Supra* Findings of Fact ¶¶ 60-64.

### 1. The Dog Sniff Did Not Improperly Extend the Duration of the Stop.

Miller did not prolong the traffic stop by running a dog sniff of the Truck. The evidence demonstrates Miller was processing the traffic stop expeditiously. Miller made contact with Salcido-Gonzalez within 30 seconds of the vehicles stopping on the side of the interstate.[251] After Miller asked Salcido-Gonzalez for the Truck rental agreement, Salcido-Gonzalez was unable to locate a physical copy and started searching his phone.[252] Miller then asked Salcido-Gonzalez to accompany him to his patrol car so that Miller could continue processing the traffic stop while Salcido-Gonzalez kept looking for the rental agreement.[253] Miller, accompanied by Salcido-Gonzalez, entered the patrol vehicle within three minutes of the vehicles stopping.[254] In less than three additional minutes, Miller had relayed Salcido-Gonzalez's driver license information to dispatch, had looked at a page of the car rental agreement, and had informed Salcido-Gonzalez that he would be conducting a dog sniff.[255] Within 30 seconds of the beginning of the dog sniff, the dog had initially alerted and Salcido-Gonzalez had interrupted the dog sniff by maneuvering behind Miller.[256] In total, the dog initially alerted within seven and a half minutes of the vehicles stopping on the side of the interstate[257]—Miller did not prolong the stop.

Miller's actions did not prolong the traffic stop. Miller asked Salcido-Gonzalez to come to the patrol car so Miller could keep the stop progressing while Salcido-Gonzalez searched for

---

[251] *Id.* ¶ 44.

[252] *Id.* ¶¶ 49-50, 53.

[253] *Id.* ¶ 57.

[254] *Id.* ¶¶ 59-64.

[255] *Id.* ¶¶ 60-64.

[256] *Id.* ¶ 64

[257] *Id.* ¶¶ 67-69.

the rental agreement.[258] The record is not clear on whether Salcido-Gonzalez was still searching for the full rental agreement when Miller initiated the dog sniff, but regardless, Miller was still waiting on dispatch to return pertinent driver's license information related to the traffic stop.[259] Accordingly, Miller conducting the dog sniff did not prolong the traffic stop.

### 2. Miller had Reasonable Suspicion Salcido-Gonzalez was Trafficking Drugs Prior to the Dog Sniff

Even if Miller conducting the dog sniff prolonged the traffic stop, Miller had reasonable suspicion that Salcido-Gonzalez was trafficking drugs that supported extending the stop to perform a dog sniff. While conducting the traffic stop, Miller made additional observations that combined with his prior observations to establish a reasonable suspicion that Salcido-Gonzalez was trafficking narcotics. Facts available to Miller supporting reasonable suspicion that Salcido-Gonzalez was trafficking drugs include the following:

- Salcido-Gonzalez slowing considerably after seeing Miller in a marked patrol vehicle;[260]
- Salcido-Gonzalez reclining in his seat in a way that obstructed Miller's view of his face;[261]
- Salcido-Gonzalez raising his hand to cover his face while yawing in a way that obstructed Miller's view of Salcido-Gonzalez's face;[262]
- Salcido-Gonzalez driving a rental car;[263]
- Salcido-Gonzalez driving the Truck which was rented by an absent third-party;[264]

---

[258] *Id.* ¶ 57.

[259] *Id.* ¶ 64. Evidence of the time dispatch returned information to Miller is not in the record because, at the hearing, Salcido-Gonzalez conceded that if the traffic stop was justified up until the initial dog sniff indication, then anything that happened after that point was permissible. Tr. 56:6-11. The parties agree that Miller was still waiting on dispatch when Miller told Salcido-Gonzalez he was going to conduct a dog sniff. *See e.g.* Salcido-Gonzalez Proposed Order, docket no. 45, filed May 2, 2024, at Fact ¶ 77.

[260] *Id.* ¶¶ 5-6.

[261] *Id.* ¶¶ 8-10.

[262] *Id.* ¶¶ 14-15.

[263] *Id.* ¶¶ 11, 17.

[264] *Id.* ¶¶ 54-55.

34

- Miller's observation of what appeared to be a large bulky item covered by black plastic and by a blanket;[265]
- Salcido-Gonzalez's story about his and his girlfriend's travel arrangements;[266]
- Salcido-Gonzalez's travel story being inconsistent with LPR data;[267]
- The LPR data's consistency with a quick turnaround trip to California and back;[268]
- Salcido-Gonzalez's hesitancy and nervousness;[269] and
- Salcido-Gonzalez traveling long distances overnight.[270]

While some of these observations and facts add very little to the reasonable suspicion determination, these facts combined support Miller's reasonable suspicion that Salcido-Gonzalez was trafficking drugs. Even without the LPR data, Miller would have had sufficient information creating reasonable suspicion that justified the dog sniff.

### III.   CONCLUSION

Miller's traffic stop of Salcido-Gonzalez was properly based on his observations of traffic violations. During the traffic stop, while Miller appropriately conducted traffic related activities, Miller made additional observations that added to his suspicions that Salcido-Gonzalez was trafficking drugs. Without prolonging the stop, Miller conducted a dog sniff that led to the capture of illicit narcotics. Even if Miller's actions did prolong the stop, prior to the dog sniff, Miller had sufficiently gained reasonable suspicion that Salcido-Gonzalez was trafficking drugs and this suspicion independently supported the dog sniff. Likewise, Miller's use of the LPR system did not violate the Fourth Amendment or Utah law. Both the traffic stop, and the dog

---

[265] *Id.* ¶¶ 45-46.

[266] *Id.* ¶¶ 52.

[267] *Id.* ¶¶ 20-21, 50-51.

[268] *Id.* ¶¶ 21.

[269] *Id.* ¶¶ 52, 58.

[270] *Id.* ¶ 24.

sniff were justified by reasonable suspicion even if the LPR data was not factored into the analysis. Accordingly, the Motion is DENIED.

**ORDER**

IT IS HEREBY ORDERED that Mr. Salcido-Gonzalez's Motion to Suppress[271] is DENIED. Evidence obtained from the stop and search of the vehicle, including statements made by Salcido-Gonzalez, is not suppressed by this Order.

Signed May 21, 2024.

BY THE COURT

_____
David Nuffer
United States District Judge

---

[271] Docket no. 34, filed February 26, 2024.